**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **BRANDI B.,**[1] | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 21 C 4383** |
| | ) | |
| **v.** | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| **KILOLO KIJAKAZI,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff applied for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§416(I), 423, about six years ago in May 2016. (Administrative Record (R.) 185-88). She claimed that she became disabled as of April 15, 2016, due to an amputation, emotional problems, and arthritis. (R. 185, 205). Over the next three years, which included a trip to federal court, the plaintiff's application was denied at every level of administrative review: initial, reconsideration, administrative law judge (ALJ), and appeals council. Plaintiff filed suit under 42 U.S.C. § 405(g) on August 18, 2021. The parties consented to my jurisdiction pursuant to 28 U.S.C. § 636(c) on August 27, 2021 [Dkt. #6], and completed briefing this case on April 15, 2022. [Dkt. #15]. It is the ALJ's decision that is before the court for review. *See* 20 C.F.R. §§404.955; 404.981. Plaintiff asks the court to remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an Opinion. Therefore, the plaintiff shall be listed using only their first name and the first initial of their last name.

## I.

## A.

The plaintiff was born April 29, 1976 (R. 185), making her 40 years old at the time she alleges she became disabled, and 43 when her insured status expired on December 31, 2019 (R. 12, 1071). She has a very good work record, working steadily from 1992 through 2016, with only a couple of years without earnings. (R. 192-93). Most recently she has worked in customer service and in healthcare as a front office person or secretary. (R. 240).

Plaintiff has had a history of poorly controlled diabetes and hypertension. In February of 2016, she began experiencing right foot and calf swelling. She was admitted to the hospital in April 2016 with severe sepsis, osteomyelitis, and Charcot foot. (R. 325). Sadly, treatment resulted in amputation below the knee. (R. 333). On April 29, 2016, plaintiff had her initial consult and examination for amputation rehabilitation. (R. 488). A V/Q of blood flow to the lungs indicated intermediate probability of acute pulmonary embolism. Echocardiagram showed ejection fraction at 62%. (R. 495). Unsurprisingly, plaintiff also had a number of issues due to her amputation: phantom pain, decreased balance, decreased endurance, and decreased coordination. (R. 498, 502). Obviously, there were associated difficulties with mobility, dressing, bathing, using the toilet, and general self-care. Plaintiff's functioning was further complicated by obesity. (R. 488).

Plaintiff began two weeks of inpatient rehabilitation on April 30, 2016. (R. 508-514). She progressed well, but had a lot of goals to achieve at home. (R. 532). When she was discharged for home therapy, it was noted that she had a history of anxiety and was taking Venlafaxine, prescribed by her primary care physician. (R. 516, 564). Plaintiff was single and had a 12-year-old who was staying with plaintiff's father while plaintiff was hospitalized. Plaintiff's father – and her sisters,

2

from out of town, when possible – would be helping when plaintiff got back home. (R. 516).

In May 2016, plaintiff was experiencing right shoulder pain, and an x-ray on May 6th revealed trivial inferior right shoulder glenohumeral osteoarthritis. (R. 686). In June 2016, plaintiff reported her mood was positive and that she had good family support. (R. 695, 697). Diabetes was well controlled. (R. 695).

By September, she had been wearing her right leg prosthesis for a month. (R. 698). She was attending rehabilitation therapy and was having moderate back pain. Doctors told her she could go back to work in November 2016, but she didn't feel ready. (R. 698). Plaintiff was experiencing depression and PTSD. (R. 698). And, she was struggling to pay for diabetic supplies as she was on food stamps. (R. 698).

In October 2016, plaintiff continued with physical therapy. She reported persistent low back and leg pain. It had worsened since she began wearing her right leg prosthesis. (R. 702). She needed a fit adjustment. She was only wearing her prosthesis 4-6 hours a day, limited by significant neuropathic pain and phantom limb pain. (R. 865, 867). Physical exam noted back pain and sinus tachycardia. Mood and affect were normal. (R. 705). Lumbosacral spine x-ray was normal. (R. 869). She continued with rehabilitation, but reported increased pain and significant edema. (R. 865). She also reported that Gabapentin made her "very groggy." (R. 865).

By December 2016, she was getting some disability benefits from work and was able to afford regular care and diabetic treatment. (R. 706). Her prosthesis was giving her a lot more pain (R. 706), and she was having gait issues. (R. 708). Mood and affect were again normal. (R. 708).

In January 2017, it was noted that plaintiff had an abnormal gait. (R. 713). There were a number of ambulation goals that plaintiff had not yet met. She could not walk with a cane for 15

minutes or for 250 feet. She could not walk with a rolling walker for 5 minutes. She could not lift 10 pounds from the floor. (R. 889-90). Her back pain was worse with lumbar extension than with flexion. (R. 861). She needed a socket replacement, and she had to resume physical therapy for lumbar spine pain. (R. 862). Any increase in pain medication, such as Gabapentin, had to be undertaken cautiously due to renal insufficiency. (R. 862).

In February 2017, plaintiff was still having issues with the fit of her prosthesis and her progress was hampered by finance, transportation, and insurance problems. She was hoping to get a new prosthesis, but until then, was wearing 20 ply socks due to poor fit. (R. 833). She was tearful during examination. Significant adhesions in her scar were noted. Due to overwhelming pain mechanisms, plaintiff could not tolerate minimal position changes. Her gait speed with her prosthesis was adequate for only limited household ambulation. Her pain was graded as severe and was limiting her improvement. She needed a better fitting prosthesis and skilled physical therapy. Prognosis was only fair due to severity of her impairment and decreased family/social support. (R. 838).

In April 2017, she had difficulty getting to and from therapy due to money issues and lack of transportation. (R. 844). She was noted to be emotional and stressed. (R.844). In May 2017, examination revealed limited range of motion, tenderness to palpation, and straight leg raise eliciting left hip pain. (R. 826, 827). Plaintiff reported that her pain was exacerbated by prolonged sitting and sometimes standing. (R. 824). She denied depression and anxiety. (R. 825). She was unable to ambulate very well, and this rendered her essentially homebound. (R. 825). Plaintiff's diabetes complicated her treatment: she was unable to undergo steroid injections, so medial nerve branch blocks were planned. (R. 820).

In June 2017, Dr. Blatz, plaintiff's treating pain specialist, noted that she continued to endure neuropathic pain and phantom limb sensations in the right lower extremity. (R. 786). At that time, a physical therapist noted she continued to have abnormal gait and chronic low back pain with sciatica. (R. 787). Physical therapy progress evaluation at that time showed that it was still severely difficult for plaintiff to perform a number of daily activities: sitting for more than 5 minutes, standing for more than 3 minutes, and lifting light loads. (R. 815). In July 2017, plaintiff was experiencing back pain radiating down her right leg; she also had left hip pain. Physical therapy wasn't helping. She was taking Norco for the pain, but was worried about its effects; she could not afford any other over-the-counter medications. (R. 716). In August 2017, she reported increased hip and back pain, and that physical therapy was not helping. (R. 775). Neuromuscular testing elicited extreme left hip pain, and she endured pain in the mid-thoracic back with lateral bending and extension. (R. 777). An MRI of the left hip revealed anterior labral injury and severe superior chondral degeneration. (R. 718).

In September 2017, plaintiff had a left hip steroid injection with about 30% improvement. (R. 716). Her back pain continued and had gotten worse. (R. 716). She was also under stress because she had been evicted from her apartment. (R. 717).

In December 2017, plaintiff was experiencing difficulties with her prosthesis, along with depression and sleeping problems. She continued to suffer back pain. Plaintiff walked with a single point cane, and though her balance was good, her cadence was slow. (R. 723). At that time, her BMI was measured at 45.1. (R. 1291). Her prosthesis was loose, likely due to atrophy; the doctor felt she may need "yet another prosthetic socket replacement." (R. 724). She was unable to tolerate higher doses of Gabapentin; pain medications made her sleepy and she had increased jitteriness on

Gabapentin. (R. 722). She was supposed to have a lumbar MRI, but was having insurance issues. (R. 724). Plaintiff was hoping to get back to work, but was unable to due to problems ambulating and back pain. (R. 722). She had managed to move into an accessible apartment. (R. 722).

In February 2018, plaintiff reported that she continued to have pretty severe back pain; hip pain was better with injection. Plaintiff was concerned about weight gain from the steroid injection. She was experiencing dizziness and depression. She also stopped taking Gabapentin due to side effects. She was behind on taking blood pressure medication due to financial issues. (R. 717).

In April 2018, back pain continued to limit plaintiff's ambulation and participation in physical therapy. (R. 1037). She was taking Nortriptyline and Gabapentin. (R. 1037). Prescriptions had to be adjusted due to issues with plaintiff's insurance. (R. 1039). She was wearing her prosthesis the entire day but had recently developed very painful blisters. She still had phantom pain and nerve pain. (R. 1037). She could ambulate slowly with a single point cane. (R. 1039).

In May 2018, plaintiff reported persistent, severe low back pain, improved with short bouts of sitting. (R. 1042). She still did not want to undergo further injections. (R. 1042). Examination showed limited range of motion in the lumbar spine due to pain, and was positive for allodynia. (R. 1043). In June 2018, she had continued pain and finally had a lumbar spine MRI. (R. 1045). The study revealed multilevel degenerative changes superimposed on a developmentally slender spinal canal, with mild bilateral neural foraminal stenosis at L2-3 and L3-4, mild to moderate bilateral neural foraminal stenosis at L4-5 and L5-S1 with mild diffuse disc bulge, and prominent circumferential epidural fat at L5-S1 contributing to partial effacement of the thecal sac. (R. 1047).

In August 2018, plaintiff reported that physical therapy, standing and walking worsened her pain, though Norco took the edge off. (R. 1354). Physical therapy was discontinued and she was

referred for pain management. (R. 1356). Examination revealed weight gain, depression, and anxiety. (R. 1354). From November 2018 through June 2019, she continued to report pain. (R. 1266, 1335, 1347-1349). In June of 2019, plaintiff was noted to be obese with depressed affect and tearful. She was moving into homeless housing with her daughter. Her prosthetic foot appeared to be internally rotated in relation to the socket. The liner was torn and there was wear on the external saline sleeve. She was able to walk with her prosthesis with a signal point cane with good balance but slow cadence. She did lean to the prosthetic side. (R. 1338). She was on a waiting list for an intensive pain program. (R. 1337).

In July 2019, it was suggested she seek emotional support or social services, but she declined. (R. 1358). Plaintiff's long term disability from her employer ended and her electricity was turned off and she sent her daughter to stay with a friend. In December 2019, she was still experiencing anxiety, and a trial of Escitalopram was ordered. (R. 1181, 1193). The Rehab/Amputee clinic plaintiff was going to closed. Plaintiff's anemia was worsening. (R. 1430). Plaintiff suffered a fall and her amputated leg became swollen and she was staying in bed. (R. 1432, 1462). She was now living with an uncle, who had health issues as well, and there was limited access to food. (R. 1438). She was, not surprisingly, suffering increased anxiety. (R. 1440).

In January 2020, she experienced increased pain after her fall, but some improvement in her anxiety with medication. (R. 1462-1463). In March 2020, plaintiff's gait was antalgic, decreased cadence, decreased pelvic and trunk rotation. Moderate loss of lumbar range of motion in all planes with the exception of flexion. (R. 1304). Physical therapist noted ambulation deficits, balance deficits, coordination/proprioception deficits, endurance deficits, pain limiting function, postural deficits, range of motion deficits, strength deficits, transition deficits. (R. 1305). One of the goals

the therapist list was for plaintiff to walk more than 165 feet more than her initial 6-minute walk test. (R. 1307). At that time, plaintiff was able to walk 304 feet in 6 minutes, with a cane, and with an 80 second break midway through. (R. 1314). Medical exam notes showed plaintiff's stump to be "exquisitely tender," and right shoulder and neck tender to palpation. (R. 1505). In May 2020, plaintiff developed a mass on the right side of her neck. It was noted that she was able to walk one to two blocks with a rest in the middle, and take one flight of stairs before stopping to rest. (R. 1530). There was chronic phantom limb pain, and possible neuroma formation. (R. 1531). In August 2020, she had socket replacement. (R. 1259). In September 2020, she reported increased anxiety, and it was noted that her diabetes was not well controlled. (R. 1578).

In December 2020, she had increased right shoulder pain, with difficulty raising her arms above her head. (R. 1600). Examination revealed decreased range of motion, pain, and decreased strength in the right shoulder. (R. 1604). Results were consistent with right rotator cuff tendinopathy or impingement rather than frozen shoulder. (R. 1605). In January 2021, Plaintiff was evaluated for chronic kidney disease. (R. 1627). Diagnoses included diabetes mellitus and likely nephropathy. (R. 1627).

**B.**

After an administrative hearing at which plaintiff, represented by counsel, testified, along with a vocational expert, the ALJ determined the plaintiff had the following severe impairments: obesity, left hip degenerative joint disease, below knee amputation, diabetes mellitus, asthma, fibroids, and degenerative disc disease. (R. 1071). The ALJ determined that plaintiff's depression and emotional difficulties stemming from her amputation caused no more than mild limitations in functioning, and were therefore non-severe impairments. (R. 1072). The ALJ then found plaintiff

did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, focusing on the listings for degenerative joint disease, major dysfunction of a joint, and degenerative disc disease. (R. 14-15).

The ALJ then determined that plaintiff could perform sedentary work except that the plaintiff was limited to:

> to occasional climbing of ramps and stairs and no climbing of ladders, ropes, or scaffolds. The [plaintiff] is limited to occasional balancing, stooping, kneeling, crouching, and crawling. The [plaintiff] is limited to occasional exposure to vibration, dust, fumes, odors, and pulmonary irritants. The [plaintiff] is limited to no foot controls on the right and no push or pull with the right lower extremity. The [plaintiff] needs a cane to walk to her work station and is limited to occasional reaching with the right dominant upper extremity.

(R. 1073). The ALJ then said that the plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. 1075). The ALJ explained there were "several inconsistencies between [plaintiff's] allegations of severe physical limitations." The ALJ then summarized the medical evidence. According to the ALJ, that evidence showed plaintiff "was not disabled only a few months after the amputation. (Exhibit C3F/4)." The ALJ further noted that the plaintiff "engage[s] in a wide range of daily activities" and "has gone to church and can shop with her daughter." (R. 1081). She did acknowledge that when plaintiff did walk longer distances, it exacerbated her pain. (R. 1081). She also noted that plaintiff planned to return to work in November 2019, and reported at that time that her general health was good. (R. 1082). The ALJ further noted that plaintiff needed an

9

ambulatory aid to move about her home, but said she accommodated this by "including a cane to walk to work station in the residual functional capacity assessment." (R. 1082). The ALJ also explained that plaintiff at one time reported that her back pain improved with "short bouts of sitting" and said she accommodated this with a limitation to sedentary work. (R. 1082). The ALJ also noted that plaintiff was not suitable for pain management due to problems with keeping physical therapy appointments (R. 1082), and that plaintiff had relief from her hip pain with a steroid injection at one time. (R. 1084). The ALJ added that while the plaintiff sometimes reported mental health problems like depression, at other times she was in a good mood. (R. 1084).

As for medical opinions, the ALJ found the opinion from one of plaintiff's treating physicians, Dr. Huang, "generally persuasive" in parts, but "less persuasive" in others. Dr. Huang said that plaintiff's pain would frequently interfere with concentration and that plaintiff had to recline for one hour every workday. Plaintiff could sit for seven hours a day, but only for two hours at a time before needing to change positions. She could stand and walk only three hours a day, could carry no more than five pounds, and would be off task 30% of the workday. The ALJ rejected that portion of the opinion regarding plaintiff's pain keeping her off task, needing to recline, and being limited to lifting five pounds. Overall, she found it extreme based on the record and plaintiff's non-compliance with medication. (R. 1084).

The ALJ gave "little weight" to the opinion from another of plaintiff's treating physicians, Dr. Blatz. Dr. Blatz felt plaintiff could sit for only 10 minutes at a time, stand for only 15, and walk for only 5. He said she could only sit for four hours total in a workday. He added that she would be off task 30% of the workday and miss five days every month. The ALJ called the opinion "extreme and unsupported by the evidence of record." (R. 17-18).

10

Next, the ALJ, relying on the testimony of the vocational expert, found that plaintiff could perform her past sedentary work as a medical secretary, admissions clerk, or order clerk. She could also perform other sedentary work that existed in significant numbers in the national economy, such as: document preparer (DOT #249.587-018; 19,000 jobs in the national economy); survey worker (DOT#205.367-054; 16,000 jobs); or tube operator (DOT##239.687-014, 3,000 jobs). (R. 1085). Accordingly, the ALJ found plaintiff not disabled and not entitled to benefits under the Act. (R. 1086).

## II.

If the ALJ's decision is supported by "substantial evidence," the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. See 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Beardsley v. Colvin*, 758 F.3d 834, 836 (7th Cir. 2014). To determine whether substantial evidence exists, the court reviews the record as a whole, *Biestek v. Berryhill,* – U.S. –, –, 139 S. Ct. 1148, 1154 (2019), but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses. *Beardsley*, 758 F.3d at 837. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits," the court must defer to the Commissioner's resolution of that conflict. *Binion v. Chater,* 108 F.3d 780, 782 (7th Cir.1997); *Schloesser v. Berryhill*, 870 F.3d 712, 717 (7th Cir. 2017).

The substantial evidence standard is a low hurdle to negotiate. *Biestek*, 139 S. Ct. at 1154; *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021). If reasonable minds could differ, the court must

defer to the ALJ's weighing of the evidence. *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020). But, in the Seventh Circuit, at least thus far, the ALJ also has an obligation to build what the court has called an "accurate and logical bridge" between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir.2010). The court has to be able to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). Even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build that "logical bridge." As *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) put it: "we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." [2] *But see, e.g., Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018)("But we need not address either of those issues here because, even if [plaintiff] were correct on both counts, we may affirm on any basis appearing in the record..."); *Steimel v. Wernert*, 823 F.3d 902, 917 (7th Cir. 2016)("We have serious reservations about this decision, which strikes us as too sweeping.

---

[2] The term "accurate and logical bridge" was first used by Judge Spottswood Robinson in a non-Social Security context in *Thompson v. Clifford*, 408 F.2d 154 (D.C.Cir. 1968), which said "'Administrative determinations must have a basis in law' and their force depends heavily on the validity of the reasoning in the logical bridge between statute and regulation." 408 F.2d at 167. Judge Posner, first used the phrase in a Social Security context in *Sarchet v. Chater*, 78 F.3d 305 (7th Cir. 1996) and would be the first to acknowledge that it was not meant as a self-defining test or formula. *Cf., United States v. Edwards*, 581 F.3d 604, 608 (7th Cir. 2009)("We recall Holmes's admonition to think things not words...."); *Peaceable Planet, Inc. v. Ty, Inc.*, 362 F.3d 986, 990 (7th Cir. 2004).

More recently, the Seventh Circuit, in a Social Security case explained that "the 'logical bridge' language in our caselaw is descriptive but does not alter the applicable substantial-evidence standard." *Brumbaugh v. Saul*, 850 F. App'x 973, 977 (7th Cir. 2021).

Nonetheless, we may affirm on any basis that fairly appears in the record."); *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012)("[District court] did not properly allocate the burden of proof on the causation element between the parties, ... No matter, because we may affirm on any basis that appears in the record.").

Of course, this is a subjective standard: one reader's Mackinac Bridge is another's rickety rope and rotting wood nightmare. But no matter what one's view of the "logical bridge" requirement, no one suggests that the "accurate and logical bridge" must be the equivalent of the Point Neuf. The subjectivity of the requirement makes it difficult for ALJs hoping to write acceptable decisions that stand up to judicial scrutiny when challenged, or when upheld at the district court level and challenged again before the Seventh Circuit.

But, at the same time, the Seventh Circuit has also called the "logical bridge" requirement "lax." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). Indeed, prior to *Sarchet*, the Seventh Circuit "emphasize[d] that [it] d[id] not require a written evaluation of every piece of testimony and evidence submitted" but only "a minimal level of articulation of the ALJ's assessment of the evidence . . . in cases in which considerable evidence is presented to counter the agency's position." *Zblewski v. Schweiker*, 732 F.2d 75, 79 (7th Cir. 1984). Later, in *Stephens v. Heckler*, 766 F.2d 284 (7th Cir. 1985), the court was more explicit when rejecting a plaintiff's argument that an ALJ failed to discuss his complaints of pain:

> We do not have the fetish about findings that Stephens attributes to us. The court review judgments, not opinions. The statute requires us to review the quality of the evidence, which must be "substantial," not the quality of the ALJ's literary skills. The ALJs work under great burdens. Their supervisors urge them to work quickly. When they slow down to write better opinions, that holds up the queue and prevents deserving people from receiving benefits. When they process cases quickly, they necessarily take less time on opinions. When a court remands a case with an order

13

to write a better opinion, it clogs the queue in two ways—first because the new hearing on remand takes time, second because it sends the signal that ALJs should write more in each case (and thus hear fewer cases).

The ALJ's opinion is important not in its own right but because it tells us whether the ALJ has considered all the evidence, as the statute requires him to do. . . . This court insists that the finder of fact explain why he rejects uncontradicted evidence. One inference from a silent opinion is that the ALJ did not reject the evidence but simply forgot it or thought it irrelevant. That is the reason the ALJ must mention and discuss, however briefly, uncontradicted evidence that supports the claim for benefits.

*Id.*, at 287 (citations omitted).  Or, as the court succinctly put it, "[i]f a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Id*. at 287-88.  In this case, however, the ALJ has not. In this case, given the evidence and the ALJ's conclusions, more of a bridge is needed than the ALJ managed to provide.

### III.

A reviewing court is charged with reading an ALJ's opinion as a whole and taking a common- sense approach to its review.  *Winsted v. Berryhill*, 923 F.3d 472, 478 (7th Cir. 2019); *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). That, of course, can cut both ways.  Here, it cuts against upholding the ALJ's decision.

First, the basics.  At the time her insured status expired, the plaintiff was 43 years old.  She was, and is, Class III – or, as formerly know, morbidly – obese, with a BMI of 45.  She has degenerative disease in her lumbar spine with mild to moderate stenosis and disc bulging causing radiculopathy.  She has a left hip anterior labral injury with severe superior chondral degeneration. So, she has issues with her back, both lower extremities which, of course, burying the lede: her right leg is amputated below the knee.  Despite all that, the ALJ nevertheless determined that plaintiff was

able to climb ramps and stairs for up to two hours a day, five days a week.  The ALJ also decided plaintiff could crawl and kneel for up to two hours a day.  But, the ALJ did accommodate her amputation, prosthesis, hip impairment, and back impairment by allowing her to use a cane to get to her workstation.

At best, it's a bit of a struggle to accept the ALJ's finding.  At worst, it puts one in mind of what the Seventh Circuit said when confronted with a similar residual functional capacity finding for an obese woman with degenerative disc disease and two legs:

> If we thought the Social Security Administration and its lawyers had a sense of humor, we would think it a joke for its lawyer to have said in its brief that the administrative law judge "accommodated [the plaintiff's] obesity by providing that she could never [be required as part of her work duties to] climb ladders, ropes, or scaffolds, and could only occasionally climb ramps or stairs, balance, kneel, crawl, stoop, and/or crouch." (The administrative law judge must have forgotten that the primary consulting physician thought the plaintiff can crawl and crouch at work.) Does the SSA think that if only the plaintiff were thin, she could climb ropes? And that at her present weight and with her present symptoms she can, even occasionally, crawl, stoop, and crouch?

*Goins v. Colvin*, 764 F.3d 677, 682 (7th Cir. 2014).  The ALJ failed to explain how the plaintiff was capable of these activities when she attempted to rationalize her residual functional capacity finding (R. 1082), and the answer is not obvious from the record.

Not that the ALJ didn't provide some reasoning for a few of her findings – it just didn't make much sense.  For example, she explained that plaintiff's back pain was accommodated by a limitation to sedentary work because plaintiff, in one examination report, said "that her back pain improved with short bouts of sitting."  (R. 1082).  A full day of sitting, however, is not a "short bout."  The clear gist of that medical note – along with others – is that plaintiff needs to change positions frequently.  But, the ALJ provided no allowance for that, such as a sit-stand option or the

freedom to change positions at will. The ALJ also curiously dismissed plaintiff's hip impairment because she obtained just 30% relief with an injection on one occasion. (R. 1082). Thirty percent isn't much relief, of course, and due to issues with her diabetes plaintiff could not get repeated steroid shots that would, as the ALJ apparently thought, allow her to work all day and do a fair amount of climbing stairs, kneeling, and crawling.

Indeed, to get from A to B, the ALJ had to do a fair amount of cherry-picking. While an ALJ need not mention every piece of evidence in her opinion, she cannot ignore a line of evidence that suggests a disability. *Reinaas v. Saul*, 953 F.3d 461, 467 (7th Cir. 2020); *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013). Here, the plaintiff lost her right leg below the knee to amputation in April 2016. She was medically cleared for rehabilitation April 29, 2016, and finally discharged home on May 17, 2016. Recovery seemed to be going well in June (R. 695, 697), but of course this was only the first stage of recovery and healing post-amputation. Plaintiff had not yet been fitted with a prosthesis. That happened in August. (R. 698).

Obviously, plaintiff was unable to work those four to five months. But the ALJ found that she was not disabled as of "a few months after her amputation" citing a medical note from June 3, 2016. (R. 1082). This, of course, is an untenable finding. The note indicates that plaintiff is assisted at home (her father and perhaps daughter) and has "good family support." (R. 695, *see also* 516). The minutiae that caught the ALJ's eye apparently came from a section regarding plaintiff's employment and social history indicating she had not been disabled; before she lost her leg, obviously. (R. 696). The ALJ's interpretation of this seems to be a result in search of any snippet that is even vaguely supportive.

Once fitted for a prosthesis, plaintiff would have to learn to walk. That's not a simple

process and it certainly wasn't in this case. But the ALJ engaged in a fair amount of cherry-picking as she went through the evidence that documents the difficulties plaintiff endured. Overall, however, the picture it paints is not so bright as the ALJ depicted. Plaintiff got her prosthesis in August and, ideally, doctors felt a target date for her to return to work was November 2016. (R. 698). But she had difficulties with prosthesis and difficulties learning to walk. By September she also developed back pain and radiculopathy. She had phantom limb pain. Her issues led to depression and PTSD. (R. 698). She was taking Gabapentin and Oxycodone. Financial troubles as a result of her unemployment made things worse – she couldn't afford proper diabetic care. (R. 698). Her pain worsened through October. She could only wear her prosthetic leg about 4 to 6 hours a day significant neuropathic pain and phantom limb pain. (R. 865, 867). By December 2016, there was some progress as plaintiff was getting disability benefits from work and was able to afford regular care and diabetic treatment. But her prosthesis was giving her a lot more pain and she was having gait issues. (R. 708). So, the medical record about nine months in did not indicate that plaintiff was in any condition to head back to work.

Plaintiff's capacities were assessed in January 2017. She could not walk with a cane for 15 minutes or for 250 feet, or walk with a rolling walker for 5 minutes, or lift 10 pounds from the floor. (R. 889-90). Her prosthesis wasn't fitting properly. She continued to have pain, the treatment of which was complicated by her diabetes and renal insufficiency. (R. 862). Through February and into April 2017, things didn't improve. She had issues with her amputation scar and her pain made more than minimal position changes intolerable. Her limitations walking with her prosthesis at that point left her homebound. (R. 825-28, 838, 844). Her gait was only good enough for limited household ambulation. (R. 838). In June 2017 there was another assessment of plaintiff's physical

progress.  It was still severely difficult for plaintiff to sit for more than 5 minutes, stand for more

than 3 minutes, or and lift light loads.  (R. 815).  Follow-ups and physical therapy sessions through

August 2017 were consistent.  Plaintiff continued to suffer back pain and radiculopathy, neuropathic

pain,  and phantom limb sensations in the right lower extremity. She continued to have issues with

walking. (R. 786-87). Additionally, it turned out she was further hampered by a left hip anterior

labral injury and severe superior chondral degeneration.  (R. 718).

Through December 2017, she had difficulties with her prosthesis, along with depression and

sleeping problems.  She continued to suffer back pain.  Plaintiff walked with a single point cane, and

though her balance was good, her cadence was slow. (R. 723).  At that time, her BMI was measured

at 45.1. (R. 1291). Her prosthesis was loose, likely due to atrophy; the doctor felt she may need "yet

another prosthetic socket replacement."  (R. 724).  She was unable to tolerate higher doses of

Gabapentin; pain medications made her sleepy and she had increased jitteriness on Gabapentin.  (R.

722).  She was supposed to have a lumbar MRI, but was having insurance issues.  (R. 724).  Plaintiff

was hoping to get back to work, but was unable to due to problems ambulating and back pain.  (R.

722).  She had managed to move into an accessible apartment.  (R. 722).

That brings the record to about a year and a half after plaintiff's amputation.  Residual

functional capacity means the level of work a claimant can "perform 8 hour a day, 5 day a week ...

'regular employment' on a 'regular and continuing basis.' " *Jeske v. Saul*, 955 F.3d 583, 593 (7th

Cir. 2020); *see also Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014)(RFC is" the claimant's

ability to do physical and mental work activities on a regular and continuing basis despite limitations

from her impairments."). It has to be said, there isn't much there that depicts a person who can do

the things the ALJ said the plaintiff could do, eight hours a day, five days a week.  Moreover, recall

that, in order to qualify for disability benefits, a plaintiff has to prove that her disability "lasted or [can] be expected to last for a continuous period of not less than 12 months" 42 U.S.C.A. § 423(d)(1)(A). *See also Gedatus v. Saul*, 994 F.3d 893, 898 (7th Cir. 2021)(""To be considered disabled, [plaintiff] had to prove [ ]she was unable to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last at least 12 straight months."); *Walker v. Bowen*, 834 F.2d 635, 636 (7th Cir. 1987)("To be eligible for [disability] benefits, the [plaintiff] must show that he has been totally disabled for at least twelve consecutive months.").  A record like this certainly suggests that, at the very least, a closed period of benefits ought to have been considered. Perhaps, after these initial struggles and setbacks, the plaintiff improved, finally got a well-fitted prosthesis, and learned to walk with it to a degree where she could, as the ALJ thought, get to her work station with a cane instead of just managing to limp around an apartment.

Perhaps, but a report that the ALJ focused on (R. 1080, 1083, 1084) in that regard is a head-scratcher. When plaintiff was being fitted for yet another prosthesis in November 2019, the technician indicated under the heading "Recreational Activities", "Bicycling, Long Walks, Shopping, Domestic Chores, Dancing, Volunteer work, Drives car, two cats, Gym, Treadmill, Aerobics." (R. 1248).  Plaintiff was said to be "very active in her community", going to church regularly, and visiting family, and able to do all her activities on her own.  (R. 1248).  She walked ten to fifteen blocks everyday.  The report even indicated that plaintiff shoveled snow.  (R. 1248).

Obviously, the activities listed under the "Recreation" heading have little or nothing to do with the rest of the record; with the lifestyle of a homeless woman living with relatives or in a shelter and sending her daughter to stay with a friend, while struggling to learn to walk for a length of time

19

and at a pace that would allow her to leave her living quarters regularly. In the next physical assessment plaintiff had, just three or four months after this report, it took plaintiff 6 minutes to a hundred yards – about a city block – and she needed an 80-second break halfway through. (R. 1314). That's a far cry from the ten to fifteen blocks in the report the ALJ focused on. And it circling gives no indication that plaintiff was bicycling, dancing, and shoveling snow.

Far more likely is that the report was stating what plaintiff could once do and what her goals were with a properly fitted prosthesis. The report did indicate that plaintiff's activities "*decreased* because of pain and poor fitting p[rosthetic]" and that plaintiff "*used* to spend minimum 110-15 [sic] hours on her legs everyday." (R. 1248). It also indicated *the goal* was to regain the function she lost due to her issues with her prosthesis. (R.1248). And, tellingly, it said that plaintiff had to use a cane and generally and had to use a walker in the snow. (R. 1249). It's highly unlikely plaintiff was shoveling much snow with a walker.

But the ALJ, as noted, pointed to this report as an unlikely depiction of plaintiff's then *current* activities. And all she did to delve into the remarkable report was ask the plaintiff a single question at the hearing:

> Q: Okay. So there are notes in your file that sound like you're really active at times, there's a note that says you're caring for yourself and your children, you're going for bike rides, long walks, dancing, going on the treadmill, shoveling snow, walking 6,000 steps a day.
>
> A: No.
>
> Q: Does any of that sound like something you were doing?
>
> A: No. Only in a dream, but not –

(R. 1106). That was it. The ALJ stopped plaintiff there and didn't even indicate where in the file

20

–it's a 1600-page record -- she got that from. Given where the ALJ went with that isolated report, she ought to have looked into its meaning a bit more than that. *See, e.g, Sims v. Apfel*, 530 U.S. 103, 110–11 (2000)("Social Security proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits, . . . .").

More importantly, the ALJ accepted the report without engaging at all with the other reports that say nothing of the kind. Again, an ALJ can't simply pluck a single rose from among a bed of thorns. *Mandrell v. Kijakazi*, 25 F.4th 514, 519 (7th Cir. 2022)(ALJ cannot selectively consider medical reports); *Reinaas v. Saul*, 953 F.3d 461, 466 (7th Cir. 2020)("An ALJ 'cannot simply cherry-pick facts supporting a finding of non-disability while ignoring evidence that points to a disability finding . . . .'"). Given the record, the ALJ had to offer some explanation of why she accepted the report from the prosthetic fitting over the reports from doctors and physical therapists as to plaintiff's physical capacities. *See, e.g., Thomas v. Colvin*, 826 F.3d 953, 961 (7th Cir. 2016)("Although the ALJ was not required to mention every piece of evidence, providing 'an accurate and logical bridge' required him to confront the evidence in Thomas's favor and explain why it was rejected before concluding that her impairments did not impose more than a minimal limitation on her ability to perform basic work tasks.").[3]

---

[3] Much like the ALJ, counsel for neither side managed to come to grips with the report, and the ALJ's acceptance of it to the exclusion of other reports, in any meaningful way. The Commissioner argues that it was reasonable for the ALJ to rely on plaintiff's activities. Perhaps, but what about all the *other* descriptions of her activities and limitations? Counsel for plaintiff simply complains that the ALJ tried to equate her "ability to perform basic life activities" to "an ability to perform work related activities on a full time basis." [Dkt. #10, at 14-15]. The ALJ did not do that, but simply said the robust activities listed in the prosthetic fitting report undermined plaintiff's allegations to the contrary. (R. 1081-83). So, the argument has no value in this context. As the Seventh Circuit has made clear, it is entirely permissible to examine all of the evidence, including a claimant's daily activities, to assess whether " 'testimony about the effects of his

(continued...)

None of this is to say that, at some point following her amputation, recovery, and rehabilitation, plaintiff did not become capable of performing sedentary work. It is only to say that there are troubling gaps between the record and the ALJ's conclusions. Those gaps may be bridgeable or they may not. But without an adequate bridge, the ALJ's opinion cannot be upheld.

## CONCLUSION

For the foregoing reasons, the defendant's motion for affirmance [Dkt. #13] is denied and this case is remanded to the Commissioner.

ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

**DATE:** 7/6/22

---

[3](...continued)

impairments was credible or exaggerated.' " *Alvarado v. Colvin*, 836 F.3d 744, 750 (7th Cir. 2016) (quoting *Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016)); *see also Morrison v. Saul*, 806 F. App'x 469, 475 (7th Cir. 2020), *see also Robert S. v. Kijakazi*, No. 20 C 6286, 2022 WL 45036, at *7 (N.D. Ill. Jan. 5, 2022)("The ALJ never said that doing chores or driving indicated plaintiff could work. She said they were evidence of some basic ability to follow instructions or concentrate on simple tasks."); *Alissa K. v. Saul*, No. 20 C 3091, 2021 WL 1998235, at *8 (N.D. Ill. May 19, 2021)("there is no indication that the ALJ committed this error. He merely listed a number of plaintiff's activities – watching tv, playing video games, cooking daily, cleaning, doing laundry, driving and shopping – which clearly undermine allegations of isolation and hiding in one's rooms for days at a time."). Canned briefs and well-worn arguments may have a purpose in a type of litigation where the same issues tend arise over and over, but briefing is far more effective – and helpful to the court, *see, e.g.*, Holmes, The Law, in Collected Speeches 16 (1931) ("Shall I ask what a court would be, unaided? The law is made by the Bar, even more than by the Bench.") – when it actually addresses major issues at hand. *See, e.g., Dawson v. Colvin*, No. 11 C 6671, 2014 WL 1392974, at *10 n.2 (N.D. Ill. Apr. 10, 2014). The prosthetic fitting report, and the ALJ's treatment of it, was a major issue here and deserved more development from the parties.